SONYA DUHE                                              NO. 22-C-292

VERSUS                                                  FIFTH CIRCUIT

LOYOLA UNIVERSITY OF NEW ORLEANS,                       COURT OF APPEAL
TANIA TETLOW, AND MICHAEL GUISTI
                                                        STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Linda Wiseman
First Deputy, Clerk of Court

May 30, 2023

Linda Wiseman
First Deputy Clerk

**IN RE** LOYOLA UNIVERSITY OF NEW ORLEANS, TANIA TETLOW, AND MICHAEL GUISTI

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE NANCY A. MILLER, DIVISION "I", NUMBER 817-674

Panel composed of Judges Robert A. Chaisson,
Stephen J. Windhorst, and Cornelius E. Regan, Pro Tempore

**WRIT GRANTED**

In this defamation suit brought by Sonya Duhé against her former employer over statements made in a student newspaper and in a university-wide email, defendants Loyola University of New Orleans, Tania Tetlow, and Michael Guisti seek supervisory review of a May 11, 2022 judgment of the trial court denying their Louisiana Code of Civil Procedure Article 971 special motion to strike and awarding Dr. Duhé attorney's fees and costs associated with the motion. For the following reasons, we grant this writ, reverse the judgment of the trial court, render judgment in favor of relators awarding them reasonable attorney's fees and costs, remand this matter to the trial court for a determination of the appropriate amount of attorney's fees and costs, and dismiss Dr. Duhé's claims against relators with prejudice.

**BACKGROUND**

Dr. Duhé, a former journalist and news anchor, worked as the Director of Loyola University School of Communication and Design from 2009 to 2020. During that time she also served as a tenured professor within the school teaching students. In March 2020, Dr. Duhé was offered the position of Dean of the Walter Cronkite School of Journalism and Mass Communication at Arizona State University and the position of Chief Executive Officer of Arizona Public Broadcasting Service. On May 5, 2020, Dr. Duhé tendered her letter of resignation to Loyola in order to take the positions at ASU and Arizona PBS.

On June 2, 2020, a day on which many users of social media networking services made posts reflecting on the May 25, 2020 death of George Floyd and the

22-C-292

larger issue of race in America, Dr. Duhé posted on the social media service Twitter an image in form of a black and white hand intertwined with a caption stating:

> For the family of George Floyd, the good police officers who keep us safe, my students, faculty and staff. Praying for peace on this #BlackOutTuesday.

A hashtag - written with a # symbol - is used to index keywords or topics on social media platforms. It allows people to easily find and follow topics they are interested in. Millions of social media users around the world on Twitter, Instagram, and Facebook made posts using the #BlackOutTuesday hashtag on that day.

A former student of Dr. Duhé's and 2015 alumnus from the School of Communication and Design program, Whitney Woods, who had previously filed a complaint against Dr. Duhé through the Loyola student grievance reporting system, responded to Dr. Duhé's post with one of her own that accused Dr. Duhé of being a racist, to-wit: "You are one of, if not, THE most racist human that I have ever encountered in a professional setting."

On or about June 4, 2020, Dr. Duhé's Twitter post and Ms. Woods' response were picked up by various news organizations including ASU State Press, Azcentral.com, The Arizona Republic, The Times-Picayune/Advocate, Teen Vogue, and other news sources nationally and around the world.

On Friday, June 5, 2020, the Loyola University student newspaper The Maroon published the first in a series of articles, editorials and letters to the editor which made reference to Dr. Duhé and the allegations made against her by former students. Some of these articles included quotes from Mr. Giusti, a faculty member at the School of Communication and Design.

On Sunday, June 7, 2020, the president of Arizona State University, Mark Searle, publicly announced that ASU had retracted the job offer to Dr. Duhé to be the dean of ASU's Cronkite School.

On Monday, June 8, 2020, Loyola President Tetlow, in a press release email from the Office of the President, sent a letter to Loyola's students, faculty, administration and alumnae that detailed what steps the university was implementing with regard to improving its faculty bias incident reporting system. This letter also made reference to Dr. Duhé and the allegations made against her.

On May 17, 2021, Dr. Duhé filed her petition for damages against Loyola, President Tetlow, and Mr. Giusti, wherein she alleged that statements made by them about her in The Maroon articles and in the June 8, 2020 email from the Office of the President are defamatory *per se*, defamatory by omission, and were made with malicious intent to defame her. Additionally, Dr. Duhé alleged claims of intentional infliction of emotional distress and false light invasion of privacy. Damages sought include general damages for past, present and future physical and mental anguish, as well as special damages for past, present and future lost wages, loss of wage-earning capacity, loss of employment related benefits, and past and future medical expenses.

On August 17, 2021, relators filed a special motion to strike pursuant to Louisiana Code of Civil Procedure Article 971. A hearing on the special motion to strike was conducted on April 28, 2022. Shortly thereafter, the trial court issued a judgment on May 11, 2022, denying relators' special motion. Relators seek supervisory review of this decision.

In their writ, relators raise the following assignments of error:

1. The District Court erred in failing to conclude that Dr. Duhé's claims against Relators arose from their conduct in furtherance of their rights of free speech under the U.S. and Louisiana Constitutions in connection with a public issue or an issue of public interest within the meaning of La. C.C.P. art. 971.

2. The District Court erred in failing to address and conclude that Dr. Duhé cannot establish, for many reasons, a probability of success on her claims.

## DISCUSSION

*Standard of Review*

A review of a trial court's ruling on a special motion to strike under La. C.C.P. art. 971 presents a question of law. *Yount v. Handshoe*, 14-919 (La. App. 5 Cir. 5/28/15), 171 So.3d 381, 384. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law *de novo* and renders judgment on the record. *Id.* (*citing Thinkstream, Inc. v. Rubin*, 06-1595 (La. App. 1 Cir. 09/26/07), 971 So.2d 1092, *writ denied,* 07-2113 (La. 1/7/08)).

*Article 971 Special Motion to Strike*

Louisiana Code of Civil Procedure Article 971 provides in pertinent part:

A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.
(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
…
F. As used in this Article, the following terms shall have the meanings ascribed to them below, unless the context clearly indicates otherwise:
(1) "Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" includes but is not limited to:
…

(c) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.

(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.
…

As an initial matter, we consider Dr. Duhé's argument that defendant Loyola University is not entitled to bring a special motion to strike because it is a juridical person with no rights to free speech under the United States or Louisiana constitutions. This argument is without merit. Louisiana courts have consistently held that the "persons" who may bring a special motion to strike under Article 971 include both natural and juridical persons. *See Williams v. New Orleans Ernest N. Morial Convention Ctr.*, 11-1412 (La. App. 4 Cir. 5/11/12), 92 So.3d 572, 576, *writ granted and reversed on other grounds*, 12-1201 (La. 9/21/12), 98 So.3d 299, *cert denied*, 569 U.S. 963, 133 S.Ct. 2033, 185 L.Ed. 2d 896 (2013); *Hunt v. Town of New Llano*, 05-1434 (La. App. 3 Cir. 5/3/06), 930 So.2d 251, 254, *writ denied*, 06-1852 (La. 10/27/06), 939 So.2d 1283; *Thomas v. City of Monroe Louisiana*, 36,526 (La. App. 2 Cir. 12/18/02), 833 So.2d 1282, 1287; *Lee v. Pennington*, 02-0381 (La. App. 4 Cir. 10/16/02), 830 So.2d 1037, 1044, *writ denied*, 02-2790 (La. 1/24/03), 836 So.2d 52; *Braxton v. Louisiana State Troopers Ass'n*, 21-355 (La. App. 3 Cir. 1/5/22), 333 So.3d 516, 525, *writ denied*, 22-0201 (La. 4/20/22), 336 So.3d 467. Loyola University, as a juridical person, has the right to file an Article 971 motion.

We turn next to the relators' burden as mover. In cases where speech activities form the basis of claims, the mover must first establish that the cause of action against him arises from an act by him in exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue. *Yount*, 171 So.3d at 386. By its terms, Article 971 applies to a cause of action, not to isolated allegations within a petition with which a litigant takes issue. *Jambon v. Queen Bess Bay Owners Ass'n, Inc.*, 21-626, p.2 (La. App. 5 Cir. 12/3/21), ---So.3d---, 2021 WL 5830057.

The Louisiana Supreme Court has interpreted the phrase "in connection with a public issue" as describing speech relating to any matter of political, social, or other concern to the community. *Shelton v. Pavon*, 17-0482 (La. 10/18/17), 236 So.3d 1233, 1241 (*citing Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). To determine whether speech is a matter of public concern, the court must consider the content, form, and context of the statements, as revealed by the entire record. *Shelton v. Pavon*, 16-0758 (La. App. 4 Cir. 2/15/17), 212 So.3d 603, 610, *affirmed*, 17-482 (La. 10/18/17), 236 So.3d 1233; *Kirksey v. New Orleans Jazz & Heritage Found., Inc.*, 12-1351 (La. App. 4 Cir. 2/27/13), 116 So.3d 664, 669, *writ denied*, 13-686 (La. 5/3/13), 113 So.3d 216; *Wainwright v. Tyler*, 52,083 (La. App. 2 Cir. 6/27/18), 253 So.3d 203, 215.

Relators argue that Dr. Duhé's claims arise from their acts in furtherance of their constitutional rights of free speech in connection with a public issue or issue of public interest because the publication of news articles is among the purest exercises of free speech and a free press and that their subject matter is of public interest and concern. In particular, relators point to Dr. Duhé's status as a public figure as the newly hired dean of a public university and CEO of a state public

4

television station and the subject matter of the articles that discussed racial discrimination, the employment status of a public figure, complaints about a public employee, and conflicts between high profile individuals who contribute significantly to a city's economy as all matters which courts have found to be of public concern. *See Connick*, 461 U.S. at 148; *Williams v. Nexstar Broadcasting, Inc.*, 11-887 (La. App. 5 Cir. 4/10/12), 96 So.3d 1195, 1197; *Baxter v. Scott*, 37,092 (La. App. 2 Cir. 5/16/03), 847 So.2d 225, 232, *vacated as moot*, 03-2013 (La. 11/14/03), 860 So.2d 535; *Kirksey*, 116 So.3d at 668.

In response, Dr. Duhé does not directly address any of the case law cited by relators, but instead argues that relators' actions were not in connection with a public issue or issue of public interest because the newspaper articles and the president's email concerned her actions as a private individual as well as confidential internal investigations of student complaints against her. In support of this argument, Dr. Duhé cites a recent opinion, *Jones v. St. Augustine High Sch., Inc.*, 21-0474 (La. App. 4 Cir. 2/16/22), 336 So.3d 470. In that case, the Fourth Circuit found that a news article published by a local news organization about the termination of a local high school football coach for using a racial slur during a pre-game chant in a locker room was not a statement made in connection with a "public issue" as that term is defined in La. C.C.P. art. 971(F)(1)(a-d).

After examining the *Jones* case, we find it factually distinguishable and analytically unpersuasive in its application of the language of Article 971. To this latter point in particular, we note that it appears the court in *Jones* treated the provisions of Article 971(F)(1) as an exhaustive rather than an illustrative list of examples of the kinds of speech acts the statute is meant to cover. Its illustrative nature is indicated by the language "includes but is not limited to …". By this language, we understand there may be speech acts which do not match the examples set forth in subsections (a) through (d) to which the special motion to strike may still be applicable. The ultimate question remains whether the cause of action against a person arises "from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue." The *Jones* case may be factually distinguished as well in that, unlike the local news organization's story in *Jones*, in this case The Maroon articles and President Tetlow's email followed in the wake of several local and national news organizations reporting on the Twitter dispute between Dr. Duhé and her former students.

Upon review of the content, context, and form of the student newspaper articles and the president's email, we find that they are speech acts made in connection with multiple issues of public interest that include racial discrimination and the employment status of and complaints made against a high-profile individual. *See Connick*, *Williams*, *Baxter*, and *Kirksey*, *supra*; *see also Herrera v. Med. Ctr. Hosp.*, 241 F.Supp.2d 601, 609 (E.D. La. 2002) ("Speech relating to racial discrimination is inherently of public concern"). While some of the articles do contain reporting about confidential internal investigations of student complaints, this reporting is only a fraction of what is contained in the stories. Ultimately, reporting on confidential internal investigations and classroom conduct cannot be separated or decontextualized from the reporting on issues of significant public interest.

*The Merits of Dr. Duhé's Claims*

Having determined that relators' actions were in furtherance of their constitutional rights of free speech in connection with a public issue, the burden shifts to Dr. Duhé to show a probability of success on the merits of her claims for defamation, intentional infliction of emotional distress, or false light invasion of privacy. If she can demonstrate a probability of success on any of these claims, then the motion must fail. *Yount*, 171 So.3d at 386.

*Defamation*

We begin our analysis of Dr. Duhé's defamation claims by noting the statement of the Louisiana Supreme Court in *Trentecosta v. Beck* that "[d]efamation is an individual tort which, as a general rule, does not give rise to solidary liability." 96-2388 (La. 10/21/97), 703 So.2d 552, 558. Liability for defamation must be considered individually, and when doing so the court should consider only those statements made by the relators. *Id*. Neither Whitney Woods nor other former students who have made highly incendiary, public accusations against Dr. Duhé have been named as defendants in Dr. Duhé's suit, and their statements should not be conflated or confused with those made by the relators.

Under Louisiana Civil Code Article 2315, every act of man that causes damages to another obliges him by whose fault it happened to repair it. This obligation has been held to include defamation or the invasion of a person's interest in his reputation and good name. *Sassone v. Elder*, 626 So.2d 345, 350 (La. 1993). In order to prevail in a defamation action, the plaintiff must prove: (1) a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault on the part of the publisher; and (4) resulting injury. *Johnson v. Purpera*, 20-1175 (La. 5/13/21), 320 So.3d 374, 387. If even one of the required elements of the tort is lacking, the claim fails. *Id*.

There are three types of defamatory statements that are actionable in Louisiana: (1) false defamatory statements of fact; (2) statements of opinion which imply false defamatory facts; and (3) truthful statements which carry a defamatory implication. *Id*. at 389 (*citing Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99), 737 So.2d 706). This third type of defamatory statement is referred to in the jurisprudence as defamation by implication or innuendo, which occurs where a defamatory meaning can be insinuated from an otherwise true statement. *Id*. However, it is actionable only if the statements regard a private individual and private affairs. *Id*. (*citing Schaefer v. Lynch*, 406 So.2d 185 (La. 1981)). Where public affairs are concerned, the publication of true statements is encouraged, and there can be no civil or criminal liability for such, regardless of ill-will or improper motive on the part of the speaker. *Id*.

With these principles in mind, we turn to Dr. Duhé's claims against each individual relator.

Claims against Michael Guisti

A review of the petition shows that Dr. Duhé has not identified any public comments about her made by Mr. Guisti as defamatory. He is instead alleged to be liable *in solido* with his employer, Loyola University, for the statements made in The Maroon articles as faculty advisor and "publisher's representative" on The Maroon. Thus, Dr. Duhé has no independent claim for defamation against Mr.

6

Guisti separate from that of the claims against Loyola University. We consider these claims below.

Claims against Loyola University

A review of Dr. Duhé's petition and particular allegations shows that nearly all of the statements she alleges to be defamatory fall within this third type. She does not contest the truthfulness of the statements of fact made in the student reporting in over a dozen articles, but rather claims that the facts presented in those articles are misleading because they create an implied narrative of her as an insensitive racist homophobe while omitting facts that would show the opposite.

For example, Dr. Duhé alleges that a June 11, 2020 article in The Maroon concerning an accreditation report from 2019 which noted that the Loyola School of Communication and Design "lacks faculty diversity" but was nevertheless in compliance with all of the accrediting agency's standards for diversity and inclusiveness "creates the overall inference that Duhé was a racist and that, because of her racism, the [program] lacked 'faculty diversity.'" Dr. Duhé does not contest the truthful statements concerning the report or its findings, but rather claims that the article omits material information (available at the time of the publication) concerning her prior efforts to increase faculty diversity, as well as information within the accreditation report itself regarding diversity and inclusiveness on campus. In her comprehensive petition reviewing the statements made in seventeen pieces published by The Maroon between June 5, 2020, and March 27, 2021, Dr. Duhé identifies multiple similar instances of "defamation by omission" that do not challenge the falsity of the statements made, but rather the implications created by truthful statements that omit information that is favorable to her.[1]

Because nearly all of Dr. Duhé's claims are for defamation by implication, the question of whether these statements are actionable is highly relevant to whether she will succeed on the merits of her claims. As noted by the Supreme Court in *Johnson*, *supra*, a plaintiff's claims for defamation by implication must fail if the court determines either that the statements concern either a public figure *or* public affairs. 320 So.3d at 387. We have already determined that relators' statements have been made in connection with issues of public interest, in particular, racial discrimination and the employment status of and complaints made against a high-profile individual. This finding requires the dismissal of all of Dr. Duhé's claims for defamation by implication, in keeping with the Supreme Court's ruling in *Schaefer* that where public affairs are concerned, the publication of true statements is encouraged. 406 So.2d at 188.

Because defamation by implication is unavailable to Dr. Duhé, the remaining news stories and university email must contain either false defamatory statements of fact about Dr. Duhé or statements of opinion which imply false defamatory facts about her. *Johnson*, 320 So.3d at 390. Dr. Duhé has not

---

[1] Dr. Duhé alleges "defamation by omission" in The Maroon articles published on June 5, June 6, June 8, June 9, June 11, June 15, June 17, August 12, October 22, December 10 of 2020 and on February 8, February 24, and March 27 of 2021, as well as in editorials published June 11, 2020 and February 11 and 25, 2021.

7

identified a single false statement of fact made by relators *about her.*[2] Therefore, all that remains is for Dr. Duhé to show relators made statements of opinion that imply false defamatory facts about her.

An expression of opinion on a matter of public concern which does not imply a false fact cannot be the basis of a defamation claim. *Wainwright*, 253 So.3d at 219. With regard to statements of opinion, the Louisiana Supreme Court has stated that even if an opinion gives rise to false factual inferences, the defendant will only be liable if the statement was made with knowing or reckless falsity. *Fitzgerald*, 737 So.2d at 717. Additionally, the factual inference created by the statement of opinion must be ascertainable by a reasonable person with some degree of certainty, "[o]therwise, juries would be asked to engage in guessing-games about possible uncomplimentary inferences that can be drawn from statements of opinion, and the First Amendment protections afforded in this area would become worthless." *Id.*

An example of a statement of opinion that Dr. Duhé claims is defamatory comes from the February 25, 2021 editorial in The Maroon titled "Editorial: Here's what we want in a new School of Communication and Design director," which states in part:

> Our editorial board is in agreement that the next director should be a person of color. Having a person of color leading the school would help many students of color feel represented, when in the past they have been made to feel unwelcome.

Dr. Duhé describes this statement as defamation *per se*, defamation by omission, and malicious defamation because it implies that students who are persons of color had been made to feel unwelcome when she was the SCD director. It is difficult to ascertain with any certainty what false inferences of fact are to be drawn from the vague statement that some students of color in the past had been "made to feel unwelcome." The phrase describes a subjective internal feeling that may have been experienced by some students of color, but offers no indication of how, when, or by whom that feeling was evoked.

Furthermore, even were one to construe *arguendo* the editorial statement as an accusation that Dr. Duhé made some students feel unwelcome, such a statement is not on its face defamatory *per se*. Words that are defamatory *per se* are those which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or circumstances. *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So.2d 129, 140. When a plaintiff proves publication of words that are defamatory *per se*, the elements of falsity and malice are presumed, but may be rebutted by the defendant. *Id.*; *see also Starr v. Boudreaux*, 07-652 (La. App. 1 Cir. 12/21/07), 978 So.2d 384, 390 (holding that in defamation actions against a media defendant involving issues of public concern, the presumptions of falsity, malice, and injury do not apply). To be accused of making someone feel

_____

[2] Only one false statement of fact has been identified in the seventeen pieces published by the Maroon: the June 5, 2020 article in The Maroon stated that Nia Porter (class of 2015) served as the first African American editor-in-chief of the Maroon. In truth, there was one previous African American editor of the paper in the 1970's. Relators acknowledge that this was erroneously reported. Nevertheless, the veracity of this statement is irrelevant because this is not a fact about Dr. Duhé, but rather a fact about Nia Porter.

unwelcome is not the equivalent of accusing them of perpetrating a crime. Only by considering the extrinsic circumstances of the Twitter accusations would such a statement be considered injurious to the professional or personal reputation.

Another example of a statement of opinion claimed as defamatory by Dr. Duhé illustrates not only the difficulty of ascertaining a false factual inference but also her ability to prove the statement was made with knowing and reckless disregard for the truth. The February 25, 2021 editorial in The Maroon states:

> … Furthermore, when students have called for a more diverse faculty in the School of Communication and Design in recent years, they have often been told that while everyone would like a more diverse faculty, we just can't have one because we don't have the money to hire more new professors. Here's an opening. Take this opportunity to diversify in positions of power, because another one may not come for quite sometime.

Dr. Duhé claims this statement is defamatory because it implies that under her leadership, the SCD did not hire more faculty who were persons of color because of the excuse of not having money to hire more new professors, while in fact, Dr. Duhé did try to develop funding sources so that the SCD could hire more minority faculty members such as Will Sutton. As stated above, the claim of defamation by implication is not applicable in this case. Assuming, *arguendo*, that the statement may be construed as one of opinion instead of fact, one cannot ascertain with any certainty the facts around where, when, and by whom the representation that more diverse faculty could not be hired because of a lack of funding was made.

Nevertheless, Dr. Duhé claims that Loyola possessed information at the time of publication that this representation in relation to Dr. Duhé was patently false. In support of this claim, Dr. Duhé cites a February 14, 2020 email sent from Loyola's Dean of the College of Arts and Sciences, Maria Calzada, to Kern Maass, Loyola's Dean of the College of Music and Media, wherein Ms. Calzada relayed what she told ASU about Dr. Duhé as part of a background check. "I told [ASU] about [Dr. Duhé's] creativity to develop positions with grant funds that bring in incredible talent like Will Sutton while increasing diversity." Dr. Duhé claims that this email contradicts the false and defamatory statements made in The Maroon editorial, and "particularly undercuts the editorial's implication that Duhé did not try to develop funding sources so that the SCD could hire more minority faculty members."

It is unclear, perhaps deliberately so, how the student journalist who wrote the editorial, Daniel Schwalm, could have had knowledge of the contents of a private email between university deans concerning the employment background check of a professor more than a year prior such that he could have knowingly written the purportedly false and defamatory statements. It is also unclear from Dr. Duhé's allegations how the contents of this email could have been or were known by President Tetlow or Mr. Giusti, the persons Dr. Duhé alleges to have editorial supervision of The Maroon, such that they allowed the publication of the allegedly false statements. Neither Ms. Calzada nor Mr. Maass are named defendants in this suit nor are they alleged to be involved in any way in the publication of The Maroon. Dr. Duhé's offering of the email between them as proof that the allegedly defamatory statements were made knowingly and with reckless falsity is insufficient and unpersuasive.

A review of the other student editorials and statements of opinion published in The Maroon and claimed as defamatory by Dr. Duhé reveal the same deficiencies as the examples above: either the purportedly false implication of fact cannot be ascertained with any degree of reasonable certainty or Dr. Duhé fails to allege facts or provide evidence indicating how the purportedly false statements were made knowingly and recklessly.  For these reasons and those stated previously with regard to the inapplicability of defamation by omission, we find that Dr. Duhé has failed to show a probability of success on her claims for defamation against Loyola for statements made in The Maroon.

Claims against President Tetlow

Like her allegations against Mr. Guisti, Dr. Duhé alleges President Tetlow is liable for the statements made in the student newspaper articles as President of Loyola University with the power to intervene in editorial policy and publication decisions of The Maroon.  As we have already determined, Dr. Duhé has not shown a probability of success on the merits of her defamation claims against Loyola for the publications in The Maroon.

However, Dr. Duhé also alleges President Tetlow individually made maliciously false and defamatory statements about her in her June 8, 2020 email to the Loyola community.  We therefore examine the statements in question to determine whether they are of the kind actionable in Louisiana and whether Dr. Duhé is likely to succeed in proving all elements of the tort of defamation.

President Tetlow's June 8, 2020 email reads in part:

Dear Loyola community,

Earlier this year, we shared news that Dr. Sonya Duhé, Director of the School of Communication and Design, would be leaving Loyola University New Orleans to accept the position of Dean of the Walter Cronkite School of Journalism and Mass Communication at Arizona State University.

Over the weekend, Arizona State University announced that the Dean's position will not be filled by Dr. Duhé.  This decision was based on complaints of racial bias raised by current and former Loyola University students during her time as Director of the School of Communication and Design.  (Dr. Duhé has resigned from Loyola University.)

In social media posts and news interviews, students and alumni expressed anger and pain that centered on Dr. Duhé's comments upon the expectations about appearance in broadcast journalism - dress and makeup, ideas of physical attractiveness, weight, and particularly, hair.  These preferences by broadcasters are rooted in broader bias based on race, nationality, gender and sexuality.  Their decisions as employers about what types of people and traits are deemed "professional" are the ultimate expressions of power, of who gets opportunity and who does not.  In particular, women of color who are broadcast journalists feel the full brunt of restrictive rules of gender

about appearance and weight in addition to the seditious and disparate impact of race (like objections to natural hair).

I hear with dismay the expressions of deep pain by students who felt that the implied limits of their opportunities were expressed as fact, without regret or acknowledgment of the deep injustice embedded in those limits. I apologize on behalf of the University that Loyola did not do a better job fixing this situation that was, in fact, brought to our attention.
…

The email continues with a detailed description of the steps the university was implementing to prevent future instances of faculty bias.

Dr. Duhé claims that President Tetlow states in this email that Dr. Duhé promoted expectations about appearance in broadcast journalism that were born of her bias based on race, nationality, gender and sexuality, and that this statement is libelous and defamatory *per se*.

Upon examination, we find that the statements made by President Tetlow are not defamatory *per se*. President Tetlow does not accuse Dr. Duhé of perpetrating a crime and does not describe her as a "promoter" of bias, but rather makes two factual claims: 1) that Dr. Duhé commented upon the expectations about appearance in broadcast journalism; and 2) that bias based on race, nationality, gender and sexuality exists among employers in the broadcast industry. Dr. Duhé has not claimed either of these statements are false, but argues instead that any comments she made in the classroom regarding appearance were stated in order to make students aware of the bias that exists in the industry and prepare them for future employment. Statements of fact that are not false are not defamatory *per se*.

Dr. Duhé also argues that President Tetlow's statement that, "I apologize on behalf of the University that Loyola did not do a better job of fixing this situation that was, in fact, brought to our attention," implies that the allegations against Dr. Duhé are true and that President Tetlow knew evidence of the falsehood when she published the email. As noted above, claims of defamation by implication or innuendo are unavailable to Dr. Duhé in this case. Even assuming *arguendo* they were, Dr. Duhé's claim that President Tetlow knew evidence of the "falsehood" at the time of publication is disputed by relators.

Dr. Duhé argues that President Tetlow knew the allegations made against her were false because President Tetlow was aware that the investigations concerning student complaints of bias in the classroom concluded that Dr. Duhé had not violated the University's Discrimination and Harassment Policy. However, relators have also provided a letter from the Interim Provost to Dr. Duhé from September of 2019 which concluded with regard to the student complaints that "this case suggests that two students may have reasonably perceived bias" and that Loyola would require Dr. Duhé to participate in cross-cultural competency training that academic year. This evidence indicates that President Tetlow did not knowingly or recklessly publish any false statements about Dr. Duhé in the June 8 email.

Upon review, we find that Dr. Duhé has not demonstrated a probability of success on the merits of her defamation claims against President Tetlow.

*False Light Invasion of Privacy*

In Louisiana, the right to privacy has been variously defined as "the right to be let alone" and "the right to an inviolate personality." *Jaubert v. Crowley Post-Signal, Inc.*, 375 So.2d 1386, 1388 (La. 1979). An unwarranted invasion of a person's right of privacy may give rise to liability for the resulting harm under La. C.C. art. 2315. *Tonubbee v. River Pars. Guide*, 97-440 (La. App. 5 Cir. 10/28/97), 702 So.2d 971, 975, *writ denied*, 97-3012 (La. 2/13/98), 709 So.2d 747, *cert. denied*, 525 U.S. 958, 119 S.Ct. 142, 142 L.Ed. 115 (1998). One type of invasion of privacy consists of publicity that unreasonably places the plaintiff in a false light before the public. *Id*. The right of privacy is limited by society's right to be informed about legitimate subjects of public interest. *Id*. While the publicity need not be defamatory in nature, but only objectionable to a reasonable person under the circumstances, it must contain either a falsity or a fiction. *Brunner v. Holloway*, 17-0674 (La. App. 1 Cir. 11/2/17), 235 So.3d 1153, 1161.

As has been stated above, The Maroon articles and the President's email concerned matters of legitimate public interest including allegations of racial discrimination and the employment status of and complaints made against a public figure. Additionally, while Dr. Duhé has made many conclusory claims that statements made by relators are defamatory by omission, she has failed to identify any false statements of fact about her made by relators. For these reasons, we find that Dr. Duhé has failed to demonstrate a probability of success on the merits of her claim for false light invasion of privacy.

*Intentional Infliction of Emotional Distress*

In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Almerico v. Dale*, 05-749 (La. App. 5 Cir. 3/28/06), 927 So.2d 586, 592 (*citing White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991)). The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Id*.

Upon review, we find that Dr. Duhé has failed to allege conduct or statements by relators which are extreme, outrageous, and beyond all possible bounds of decency. Nor is Dr. Duhé likely to succeed in proving that relators Loyola, Mr. Guisti, or President Tetlow acted with desire to inflict severe emotional distress upon her or knew with any certainty that severe emotional distress would result from their conduct. We therefore find that Dr. Duhé has not shown a probability of success on the merits of her claims for intentional infliction of emotional distress.

*Conclusion*

Upon *de novo* review, we find that relators have shown that Dr. Duhé's claims against them arise out of conduct in furtherance of the exercise of their constitutional right of free speech under the United States and Louisiana

Constitutions in connection with a public issue. We also find Dr. Duhé has failed to show a probability of success for any of her claims against relators for defamation, false light invasion of privacy, or intentional infliction of emotional distress. We therefore find that the trial court erred in failing to grant relators' La. C.C.P. art. 971 special motion to strike. In accordance with La. C.C.P. art. 971(B), relators are awarded reasonable attorney fees and costs.

**DECREE**

Relators' writ application is granted. The May 11, 2022 judgment of the trial court denying relators' Article 971 special motion to strike and awarding Dr. Duhé attorney's fees and costs is reversed. Judgment is rendered in favor of relators. The relators' Article 971 special motion to strike is granted and they are awarded reasonable attorney's fees and costs. This matter is remanded to the trial court for a determination of the appropriate amount of attorney's fees and costs. Dr. Duhé's claims against relators are dismissed with prejudice.

Gretna, Louisiana, this 30th day of May, 2023.

**RAC**
**SJW**
**CER**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY <u>05/30/2023</u> TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-C-292**

### E-NOTIFIED

24th Judicial District Court (Clerk)
Honorable Nancy A. Miller (DISTRICT JUDGE)
Julie D. Livaudais (Relator)
Douglas L. Grundmeyer (Relator)
Jeremiah A. Sprague (Respondent)

### MAILED

Charles D. Marshall, III (Relator)
Attorney at Law
1100 Poydras Street
Energy Centre, Suite 2300
New Orleans, LA 70163-2300

Gary J. Giepert (Respondent)
Attorney at Law
4603 South Carrollton Avenue
New Orleans, LA 70119

Timothy J. Falcon (Respondent)
Jarrett S. Falcon (Respondent)
Attorneys at Law
5044 Lapalco Boulevard
Marrero, LA 70072

SECURITY

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Charles D. Marshall, III
Attorney at Law
1100 Poydras Street
Energy Centre, Suite 2300
New Orleans, LA 70163-2300
22-C-292                          05-30-23

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 2434 6249 3633 38

2. Article Number (Transfer from service label)

7016 2070 0000 0954 6496

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Mac Donald_        ☐ Agent
                       ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...lall
☐ ...tail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt